STATE OF MAINE                                SUPERIOR COURT
YORK, ss.                                     Civil Action
                                              Docket No. CV-13-0275


KENNETH R. LAVIN and
NANCY J. LAVIN,

              Plaintiffs,

v.                                            **MEMORANDUM OF DECISION**
                                              **AND FINAL JUDGMENT**

R. L. CHASE BUILDING MOVERS, INC.,
a/k/a CHASE BUILDING MOVERS, INC.,
and CHRISTOPHER CHASE

              Defendants.

Plaintiffs Kenneth and Nancy Lavin filed this action against Defendants R. L. Chase Building Movers, Inc. (a/k/a Chase Building Movers, Inc.) and Christopher Chase claiming damages arising from work done on their barn in 2012. They base their claims on allegations of breach of contract, breach of warranty, fraud, and violation of the Home Construction Contract Act, 10 M.R.S. §§ 1486 *et seq.* Defendants assert counterclaims for breach of contract, *quantum meruit*, unjust enrichment, and violation of the Prompt Payment Act, 10 M.R.S. §§ 1111 *et seq.* A two-day bench trial was held on April 12 & 13, 2017. Based on the testimony and evidence presented at trial, and taking into consideration the post-trial submissions of counsel, the court finds, concludes, orders and adjudges as follows.

## I. Findings of Fact

The Lavins own property at 1682 Post Road in Wells, Maine. On the property is a house with outbuildings, including an attached shed ("Shed") and a barn ("Barn"). At the time the property was purchased in 2011, the Barn, which was used exclusively

1

for storage, was in need of repair. Some work had been done on the Barn in the past, but it retained a traditional, timber-frame structure.

In early May 2012, Nancy Lavin ("Lavin") placed an advertisement on Craig's List seeking a contractor to repair the Barn. Defendant Christopher Chase ("Chase") answered the advertisement. Chase is the sole shareholder and agent of Chase Building Movers, Inc., a Maine corporation engaged in the business of residential construction and maintenance services located in Wells, Maine. In May 2012, the business was known as R. L. Chase Building Movers, Inc. Chase's company advertises as one of its services "Barn/Timber Frame Restoration."

Lavin and Chase met on May 5, 2012. They discussed the prospective work. Their respective recollections of the details of their conversation differed in a number of material ways.

According to Lavin's testimony, Chase assured her that he and his crew had experience with barns and had the knowledge and experience to do the job. She understood that Chase would start the work within a few weeks; that, once begun, the job would take two to three weeks to complete; that labor would be charged at the rate of $40 per hour; that Chase and a crew of up to two additional men would do the work; that Chase had insurance; and that Chase was a current or former town official. She testified that Chase had assured her there was no need for a written contract; and that because she understood Maine law to require a written contract for jobs costing more than $3,000, she assumed that this work would cost less than $3,000.

Regarding the work to be done, Lavin testified that the rotted sill of the north wall needed to be replaced, and she thought Chase was only going to replace the sill. She testified that Chase drew a rough sketch with a couple of lines; that he took no

2

measurements; and that there was no other description of the work. In hiring Chase to do the job, it was her intent to "save the barn as a barn."

According to Chase's testimony, he agreed that Lavin indicated the north wall sill was rotted and needed to be replaced. They attempted to inspect the north wall from inside the Barn but were unable to do so because it was filled to capacity with stored items—"full of everything," was how Chase described it. They went around the back of the Barn to view the wall from the outside. Rot was plainly visible on the exterior wall. Chase said he pulled off a number of rotted shingles to get a closer view of the wall's condition. He drew a rough sketch of the Barn's footprint. There is writing on the sketch, which states in part: "Replace 6' x 6' sill with p.t." and "Replace studs as needed." (Exhibit 7). It was clearly his understanding that the job involved more than just replacing the sill, and also required removing and replacing part of the north wall.

He testified that Lavin and he orally agreed that he would do the job; that he would charge for labor at the rate of $45 per hour, which was his standard rate; that this only included construction labor and did not include anything else, such as clean up or disposal unless requested; that Lavin would pay for or provide all materials; that they did not discuss a written contract; that they did not discuss the figure of $3,000 for the work; that she would remove the items stored in the Barn before he started work; and that when the building permit was issued and the barn cleaned out he would be there within two weeks to start work.

Chase did not start the job until later in 2012. He went back one or two more times within a month after the initial May 5th meeting, once with his stepson. The items stored in the Barn had not been removed. Lavin contacted Chase in July, and again in August. On each occasion Chase told her he was too busy at that time with

3

other work to do her job. In the August conversation, Chase told her he would be unable to get to the job until the fall.

On October 16, 2012, Chase came over to inquire about the status of a building permit. Upon learning that Lavin had not yet obtained one, Chase went to the town offices and applied for a permit. The application described the project as: "[R]eplace 37 linear feet of wall and plates to match original;" the cost of the work was shown as $10,000. (Exhibit 2.)

On October 19, 2012, Lavin went to the town offices to retrieve the building permit. The permit bears her signature. It described the work as: "Replace 37 linear feet of existing garage wall and sill plates to match original. Total of 370 Sq. Ft." (Exhibit 4.) It described the cost of work as $10,000. The cost of the permit was $90.50.

Chase began the job on October 18, 2012. At times there was a crew of up to five men, including Chase, present on the job.[1]

At Lavin's request, Chase used materials that she had on hand, including a number of 2' x 8' boards and ¾" plywood sheets. During the course of the work, Lavin purchased additional building material and supplies from Morse Hardware and Lumber totaling approximately $ 2,993.33.

Chase and his crew removed a ten-foot high section of the north wall, up to the second floor. A couple of posts on the north side of the building that supported the second floors were partially rotted, particularly near the base. Chase disconnected the two carrying beams supporting the second floor of the Barn, and replaced the posts up to that point with new posts consisting of laminated 2' x 8' boards acquired from Lavin.

---

[1] Chase hired several workers for this job from another company, Frame to Finish, at a cost of $4,865.

The north wall was replaced in a modern, "stick-built" fashion with materials furnished by Lavin. An exterior door, which she provided, was installed at Lavin's request.

Many of the original barn boards comprising the north wall siding were rotted in whole or part, especially from the lower portion of the wall. Other boards were in mixed condition. On the whole, the evidence does not establish that it is more likely than not that boards removed from the north wall (or west wall) as a whole had significant value.

Chases' crew was on site working during the period from October 18th to October 26th, 2012. Lavin was present every day of the work except for one day when she was out of town. During the course of the work she was frequently in the vicinity of the Barn. She had a full opportunity to, and did, regularly view the work and interact with the crew. She took photos of the work in progress. As things came up during construction, Lavin discussed them with Chase and his crew.

During the job Chase discovered that the sill under the west wall was also rotted. According to his testimony, which the court found credible, he informed Lavin and she authorized him to repair the sill and wall. Chase replaced the sill and, as he had done on the north side of the Barn, removed and replaced a section of the west wall. Lavin disputes that she authorized the full extent of the work Chase and his crew undertook on the west wall. There was no written agreement about the change in the scope of the work. At no time did she request the work be stopped or that the terms of Chase's engagement be renegotiated. Her presence at the property throughout the time the work was underway gave her the opportunity to do so.

On Friday October 26, 2012 Chase presented Lavin with a bill for $7,740. The amount of the bill reflected 172 hours of labor at $45 per hour up through October 25th. Lavin did not pay the bill that day, despite Chases' insistence. According to her

5

testimony, because she believed the amount of the bill was going to be $3,000 based on her May 5th conversation with Chase, she had not deposited sufficient funds in her account to pay the full amount of the bill.

The following Monday, October 29th, Chase returned and presented Lavin with another, updated bill which included the additional 16 hours of labor (at $45 per hour, totaling $720), which reflected work on the previous Friday, October 26th. The total bill, including this additional time, was $8,460. If the rate for labor was charged at $40 per hour, the total bill, including these additional 16 hours of labor, would have been $7,520.

Lavin paid Chase $5,000 on October 29, 2012.

Chase removed his crew and equipment from the job site on October 29, 2012. At the time the work had been substantially finished. The joints on two posts on the north wall required minimal modification, primarily for aesthetic purposes. This would have involved installation of a metal plate or bracket at minimal expense, and was not essential for structural soundness. Since he was being paid on an hourly basis, and payment was being refused for work already performed, Chase considered this refusal to terminate his work. He did not clean up the site for the same reason.

Plaintiffs are dissatisfied with Chase's work. They view the "stick-built" construction as compromising the structural and aesthetic integrity of the Barn.

As far as the quality and soundness of Chase's work is concerned, the court finds the testimony of Defendants' expert, Keith Kallberg, to be more credible and persuasive than the testimony of Plaintiffs' experts. Based on the testimony of Mr. Kallberg, together with other record evidence, the court finds it is more likely than not as follows:

6

- The new construction in the NE corner of the Barn abuts the Shed but is not affixed or attached thereto; and that prior to Defendants' work on this job that was also the case, i.e. the Shed and the Barn abutted one another but were not affixed or attached.

- The gap near the NE corner of the Barn is, in fact, a gap between two pre-existing parts of the old Shed and not a gap between the Shed and Defendants' new construction on the Barn.

- This gap predated Defendants' work on the job.

- As of October 2014, the Barn was plumb and level, and the Shed was not; and the record evidence does not establish any change in these respective states.

- The Barn is structurally sound.

- The junctions of the Barn's cross beams with Post F and Post I, as so-identified in Exhibit 1, are structurally adequate. This is also consistent with the testimony of Helen Watts, who opined that even if these junctions were not historically authentic or aesthetically preferable, and even if they were considered "temporary", they are nonetheless structurally adequate.

- The second floor of the barn is not level, and does not extend fully to the north wall. Both of these conditions predated, and were not exacerbated by, Defendants' work.

Even though the two junctions at Post F and Post I appeared "temporary" in nature, they are structurally sound and could be completed in relatively simple,

inexpensive fashion by adding a steel or metal plate and/or "L". The evidence does not establish specifically how much this would cost.

The evidence as a whole does not establish that it is more likely than not that the "overhang" observed under the north wall, beginning at the NW corner and decreasing as it runs to the NE wall, was a result of building movement attributable to Defendants' work. Nor does the evidence establish that it is more likely than not that the north wall of the Barn has moved as a result of Defendants' work. There is no evidence that Defendants' work resulted in any specific violation of local ordinances or building codes. There was no discussion or agreement about the particular style of construction that Chase was to employ. The court infers from, among other things, the facts that Lavin furnished the building materials for the job, was present on a daily basis to observe the work being done, and expected to pay less that $3,000 that there is no reasonable basis to find that Chase was expected to repair the barn in the traditional timber-frame style.

## II. Conclusions of Law

### A. Plaintiffs' Claims

#### 1. Count I—Breach of Contract

Establishment of an express contract requires that the parties mutually assent "to be bound by all its material terms; the assent must be manifested in the contract, either expressly or impliedly; and the contract must be sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties." *Forrest Assocs. v. Passamaquoddy Tribe*, 2000 ME 195, § 9, 760 A.2d 1041; *VanVoorhees v. Dodge*, 679 A.2d 1077 (Me. 1996); *Roy v. Danis*, 553 A.2d 663 (Me. 1989)); *see also* Horton & McGehee, *Maine Civil Remedies* § 10-3(b) (4th ed. 2004) (mutual assent requires "minds of the parties must have met on all material terms.")

8

There was no meeting of the minds with respect to all material terms of an express oral contract, including the contract price, the time for commencing and completing the work, and the scope of the work.

Lavin believed that the initial scope of the work included replacing the rotted sill under the Barn's north wall, and maybe a small portion of the shingles on the lower part of the wall. It was her understanding that Chase would hire no more than two additional men and charge at the rate of $40 per hour. It was her understanding that the work would be started within a few weeks and, once commenced, completed within two to three weeks; and the total cost of the work would not exceed $3,000.

That was not Chase's understanding or intent. He understood the initial scope of the work to include not only replacement of the sill but also tearing out and replacing a large section of the north wall up to the second floor. It was his understanding that he would charge time and materials at the rate of $45 per hour; and that the work would commence once Lavin obtained the building permit and cleaned out the Barn.

Plaintiffs have not met their burden of proving the existence of an express oral contract.

## 2. Count II—Breach of Warranty

Based on the testimony of Defendants' expert, the court has found it is more likely than not that Chase's work was not defective and was done in a workmanlike manner; and that the barn is structurally sound. While Chase's work may not have satisfied Lavin's aesthetic expectations, there is no basis in the record to conclude that any such warranty was given or was reasonable in the circumstances. Plaintiffs have not met their burden of proving a breach of warranty.

9

### 3. Count III—Fraud

A person is liable for fraud if he makes a false representation of a material fact with knowledge of its falsity (or in reckless disregard of whether it is true or false) for the purpose of inducing another person to act or to refrain from acting upon it, and the other person justifiably relies upon the representation to her detriment. *Barr v. Dyke,* 2012 ME 108 ¶ 6, 49 A.3d 1280; *Rand v. Bath Iron Works Corp.,* 2003 ME 122 ¶ 9, 832 A.2d 771. Fraud must be proven by clear and convincing evidence. *Picher v. Roman Catholic Bishop of Portland,* 2009 ME 67, ¶ 56, 974 A.2d 286.

Plaintiffs have not met this burden. While there was a lack of communication and understanding about the nature and cost of the work, Plaintiffs have not established by clear and convincing evidence that Chase knowingly or recklessly made false representations of material facts upon which Plaintiffs relied to their detriment.

### 4. Count IV—Home Construction Contract Act

Maine law provides that a "home construction contract for more than $3,000 in material or labor must be in writing and must be signed by both the home construction contractor and the homeowner or lessee" and must satisfy a number of statutorily prescribed provisions. 10 M.R.S. § 1487. Defendants violated the HCCA, and concede as much.

Even though there was a clear violation of the HCCA, it does not appear that the statute offers an effective remedy to Plaintiffs in this instance. The HCCA itself provides no remedies, but rather declares a violation to be *prima facie* evidence of a violation of the Unfair Trade Practices Act, Title 5, chapter 10 ("UTPA"). 10 M.R.S. § 1490(1) (violation of the HCCA "shall constitute *prima facie* evidence of a violation of the Unfair Trade Practices Act, Title 5, chapter 10.").

10

Section 213(1) of the UTPA provides that a person who purchases services or property primarily for personal, family or household purposes *"and thereby suffers any loss of money or property, real or personal,"* as a result of a method or practice that violates the UTPA may bring an action for "actual damages, restitution and for such other equitable relief, including an injunction, as the court determines to be necessary and proper." 5 M.R.S. § 213(1) (emphasis added). Plaintiffs have not met their burden of proving it more likely than not that they have suffered a loss of money or property resulting from a method or practice that violates the UTPA.

First, the damage to Plaintiffs' personal property (*e.g.*, sewing machines, molds and/or other items stored in the Barn) is not a loss that resulted from a "method, act or practice" that violates the UTPA. *Id.* The HCCA violation itself is not a proximate cause of the damage to the personal property.[2]

Second, the evidence as a whole supports the conclusion that Plaintiffs have not suffered a loss of money or property resulting from Chase's failure to comply with the statutory requirement for a written contract or from the work Chase performed. Plaintiffs have not proven it is more likely than not that the Barn has less value now than it had prior to Chase's work. The court has found it is more likely than not that the Barn is structurally sound; that the rotted portions of the sill and wall have been replaced; that Chase's work was not deficient; and that the work was substantially complete with the exception of two minor modifications (adding a metal plate or bracket) to the Post I and Post F joints, the value of which has not been specifically established. It is neither reasonable nor credible to expect based on the instant record

---

[2] Even if Chase or his crew were responsible for the damages alleged to Lavin's personal property in the Barn, Plaintiffs have not asserted an alternate theory of recovery upon which relief can be granted.

11

that the scope of work included restoration of the Barn in an historically authentic manner using timber-framed construction.

For the foregoing reasons, judgment will be entered for Defendants on all counts of the complaint.

**B. Defendants' Counterclaims**

Defendants' have asserted counterclaims based on breach of contract; *quantum meruit*; unjust enrichment; and violation of the Prompt Payment Act, 10 M.R.S. §§ 1111-20.

**1. Count I—Breach of Contract**

For the reasons discussed above in Section II(A)(1), Defendants also have failed to prove it more likely than not that there was a meeting of the minds as to all material terms of an express oral contract. The counterclaim for breach of contract fails.

**2. Count II—*Quantum Meruit***

A claim in *quantum meruit* seeks to recover for labor, services or materials provided pursuant to an implied contract, which is inferred from the conduct of the parties. *Runnells v. Quinn*, 2006 ME 7 ¶10, 890 A.2d 713; *Paffhausen v. Balano*, 1998 ME 47, ¶ 6, 708 A.2d 269. A *quantum meruit* claim may lie when an express contract is void for lack of mutual assent. Horton & McGehee, *Maine Civil Remedies* § 11-2(a)(2) (4th ed. 2004). Failure to comply with the Home Construction Contract Act does not bar recovery under a *quantum meruit* theory. *See Runnells*, 2006 ME 7 ¶ 9, 890 A.2d 713.

The evidence establishes that Defendants provided labor to rebuild portions of the Barn; that this work was done for the Lavins with their knowledge and consent; and that it was provided under circumstances that make it reasonable for Chase to expect payment. *Runnells*, 2006 ME 7 ¶10, 890 A.2d 713; *Paffhausen*, 1998 ME 47, ¶ 6, 708 A.2d 269. Defendants commenced the work with Lavin's agreement. She was aware of the

12

nature and extent of the work as it progressed. She was aware of the changes in scope of the work, and she requested some of the changes, such as the installation of the door in the reconstructed north wall. During the work she did not object or demand that Chase cease.

The measure of recovery in *quantum meruit* is the reasonable value of the labor, materials, goods or services provided. Horton & McGehee, *Maine Civil Remedies,* § 11-2(a) (4th ed. 2004). In the circumstances, the court finds the $40 per hour rate for labor on this job was a reasonable rate, and was one that Lavin herself had agreed to pay. Based on the $40 per hour rate, the reasonable value of Chase's labor for this job was $7,520. Plaintiffs have paid Chase $5,000. The balance of $2,520 will be awarded to Chase.

### 3. Count III—Unjust Enrichment

Defendants have established an implied contract as the basis for recovery under the theory of *quantum meruit.* This forecloses their unjust enrichment claim. *See* Horton & McGehee, *Maine Civil Remedies,* § 7-3(a) (4th ed. 2004) (Unjust enrichment only a basis for recovery where there is no contractual relationship).

### 4. Count IV—Prompt Payment Statute, 10 M.R.S. § 1111 *et seq.*

The Prompt Payment Statute does not create an independent cause of action, but does provide remedies to one who prevails on a contract or *quantum meruit* claim. *Jenkins, Inc. v. Walsh Bros.,* 2001 ME 98, ¶ 31, 776 A.2d 1229, 1239. The remedies under the statute, however, are not without limitation. The court finds that Plaintiffs have disputed and withheld payment of the balance owed in good faith, and therefore should not be subject to penalties and fees otherwise assessable under this statute. *See* 10 M.R.S. § 1114.

13

### III.  Judgment and Order

Accordingly, it is hereby ordered the entry shall be:

1.  Judgment for Defendants on Counts I, II, III, and IV of Plaintiffs' Complaint;

2.  Judgment for Plaintiffs on Counts I, III, and IV of Defendants' Counterclaim;

and

3.  Judgment for Defendant on Count II of their Counterclaim in the amount of $2,520 plus interests and costs.

**SO ORDERED.**

DATE:    May 18, 2017

_____
Wayne R Douglas
Justice, Maine Superior Court

ENTERED ON THE DOCKET ON: 5/18/17

14

CV-13-275

ATTORNEYS FOR PLAINTIFF:
MICHAEL J O'TOOLE
SANDRA L GUAY
WOODMAN EDMANDS DANYLIK AUSTIN
PO BOX 468
BIDDEFORD ME  04005

ATTORNEY FOR DEFENDANT
THOMAS MCKEON ESQ
RICHARDSON WHITMAN LARGE & BADGER
PO BOX 9545
PORTLAND ME  04112